UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| JOHN P. ANDERSON, | Case No. 13-cv-04825-RS |
|---|---|
| Plaintiff, | |
| v. | **ORDER DISMISSING THE TRIBAL ENTITIES, GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO THE INDIVIDUAL DEFENDANTS, AND DENYING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS** |
| JACK DURAN, et al., | |
| Defendants. | |

## I. INTRODUCTION

Plaintiff John Anderson is the Sheriff of Madera County, located outside of Fresno in the Eastern District of California. The specific dispute at issue in this case is but a piece of a larger struggle which began in 2011 for control and direction of the Picayune Rancheria of the Chukchansi Indians ("the Tribe"), a federally recognized tribe. The territory of the Tribe rests wholly within Madera County. At its core, this action represents a reaction by the plaintiff Sherriff to orders he has received from certain tribal factions directing him to intercede against their opponents. While the entirety of the case rests on actions taken within the Central District of California, the parties do not dispute venue in this district as will become apparent below.

In August 2013, individuals purporting to represent the tribal council filed suit in tribal court against Anderson and others seeking damages and injunctive relief. The tribal court issued a temporary restraining order directing Anderson, who is not a member of the Tribe, to take certain steps in execution of his official duties as Sheriff. Shortly thereafter, Anderson filed suit in this Court, seeking a temporary restraining order ("TRO") and preliminary injunction against the Tribe, affiliated tribal entities, individual members of a group purporting to comprise the legitimate tribal council (the "Lewis Faction"), and the judge and clerk of the purported tribal court (the "Lewis Tribunal"). Anderson sought to prevent any of the individuals or entities from

enforcing the TRO issued by the Lewis Tribunal and to stay further proceedings against him in that court. This Court conducted a hearing that same day at which representatives for the Lewis Faction as well as from a competing group, the Ayala Faction, participated. These two groups, along with a third contingent known as the Reid Faction, each purport to represent the Tribal entities in this action. At the conclusion of the hearing, Anderson's TRO was granted and an order to show cause issued as to his application for a preliminary injunction. The terms of the TRO were later incorporated into a preliminary injunction, which remains in effect.

Anderson now moves for summary judgment, seeking declaratory and injunctive relief against the Tribal entities and the individual defendants. The Lewis/Reid Faction, on behalf of the Tribal entities and individual defendants, opposes that motion and simultaneously moves for judgment on the pleadings or, in the alternative, summary judgment. The Tribal Court defendants, Jack Duran and Donna Howard, join the Lewis/Reid Faction's opposition and motion. The Ayala Faction, on behalf of the Tribal entities, joins Anderson's motion and opposes the Lewis/Reid Faction's counter-motion.

For the reasons set forth below, Anderson's motion is granted as to the individual defendants. His motion is denied, and the case is dismissed, as to the Tribal entities on the basis of sovereign immunity. The Lewis/Reid Faction's motion is denied.

II.  BACKGROUND

The saga underlying this action tells the story of shifting allegiances and confusing occurrences. As noted above, the Tribe is a federally-recognized tribe located in Madera County, California. The Chukchansi Economic Development Authority (CEDA) is a wholly-owned, unincorporated unit of the tribe, which is located on the Rancheria immediately adjacent to the Tribe's gaming facility. The Chukchansi Indian Housing Authority (CIHA) is also a wholly-owned, unincorporated unit of the Tribe. It has historically operated under the independent control and guidance of directors appointed by the Tribe. Collectively, the Tribe, CEDA, and CIHA are referred to herein as the "Tribal entities."

The California Rancheria Act of 1958 terminated the Tribe's federal relationship, stripped

its members of their status as Indians, and distributed through the Bureau of Indian Affairs ("BIA") land previously held in trust for the Tribe to private ownership subject to state and local laws. *See Hardwick v. United States*, Case No. 79-1710-JF, 2006 WL 3533029 (Dec. 7, 2006) (recounting the history of the Tribe). In 1979, individuals representing thirty-four of the terminated tribes, including the Picayune Rancheria, brought a class action lawsuit in the Northern District of California to challenge the termination of the trust relationship under the California Rancheria Act. A stipulated judgment was entered that restored the Indian status of members of seventeen of the former tribes, including the Picayune Rancheria. The settlement required the Secretary of the Interior to recognize the tribes and provided a mechanism whereby former tribal lands could be reconveyed to the United States to be held in trust for the benefit of the individual tribes. The court retained jurisdiction for disputes arising from that settlement.

The Picayune Rancheria began taking formal steps to reorganize in 1986. Disputes soon arose as to the boundary of the Picayune Rancheria relative to the neighboring North Fork Rancheria and the state and local tax consequences flowing from the termination and restoration of the tribe. A second stipulated judgment was entered in this district in 1987, confirming the boundaries of the two Rancherias and attempting to resolve the tax dispute. It did not, and additional disputes arose between the Tribe and Madera County concerning ad valorem property taxes and land use to develop hotel and gaming facilities.

In 2007, Madera County and the Tribe agreed to settle three pending lawsuits in the Madera County Superior Court and the Northern District of California concerning taxation and land use of a parcel of property in Madera County owned by the tribe and on which it had developed the Chukchansi Gold Resort & Casino ("the Casino"). As part of the "Settlement Agreement," the Tribe agreed to pay various sums to the Madera County General Fund, the Yosemite Unified School District, and a trust account to be disbursed pursuant to a memorandum of understanding ("2007 MOU"). In exchange, the County agreed to remove its opposition to the Tribe's pending fee-to-trust application before the Department of Interior to convert the property into tribal land.

Relevant to this litigation, the 2007 MOU included several provisions pertaining to law enforcement on the Rancheria and other tribal land. California has held criminal law enforcement jurisdiction on tribal lands within the state since 1953 pursuant to Public Law 280,[1] and the 2007 MOU begins by confirming joint law enforcement authority between the Tribe and the County. Pursuant to the MOU, the Tribe is to have primary responsibility to maintain order and safety within the Rancheria and all lands held in trust by the United States for the benefit of the Tribe, with assistance "from time to time" by the Madera County Sheriff's Department. Additional provisions require the Sheriff to provide law enforcement services related to the gaming facility. The Tribe agreed to a limited waiver of sovereign immunity for any mediation or litigation necessary to interpret and enforce the agreement. The parties further agreed to submit any subsequent litigation arising out of the MOU to the federal court in this district. The Settlement Agreement was signed by the Tribe, CEDA and Madera County, among others. The MOU was signed by the Tribe and the County. Neither CIHA nor the Sheriff's office were parties to either agreement.

The Tribe has been subject to an intra-Tribal leadership dispute since December 3, 2011, when a disagreement arose as to whether one of the individuals elected to the Tribal Council was eligible to be seated in that body. That dispute lead to a split between the Lewis Faction and the Reid Faction. At that time, the Ayala Faction sided with the Lewis Faction. In February 2013, a second split arose between the Ayala Faction and the Lewis Faction. Thus, three different groups have purported to represent the Tribal Council and other Tribal entities during the events leading to the instant case.

In the midst of this conflict, both the Lewis Faction and the Ayala Faction established tribal courts, each purporting to be the sole legitimate adjudicatory body of the tribe. The two

---

[1] Enacted on August 15, 1953, Public Law 83-280 (commonly referred to as "Public Law 280") provides that five states, including California, "shall have jurisdiction over offenses committed by or against Indians" in Indian country "to the same extent that such state" has criminal jurisdiction elsewhere within the state.

tribunals have issued conflicting orders each recognizing the bodies that appointed them as the Tribe's sole authorized government and otherwise attempting to exert control over various aspects of the Tribal dispute, including tribal property and financial assets. Specifically at issue in this case, representatives of the Lewis Faction filed an action in the Lewis Tribunal against individuals from the competing factions and against Anderson in his official capacity, seeking injunctive relief and $5 million in damages. In August 2013, Jack Duran, Jr., judge of the Lewis Tribunal, issued a TRO against Anderson, including several directives concerning his law enforcement activities on the Rancheria as they pertained to the Ayala Faction, which at the time was physically occupying the Casino and other tribal property.

In October 2013, Anderson brought this action seeking declaratory and injunctive relief against the individuals who brought the underlying tribal complaint in the Lewis Tribunal, the judge and clerk of the Lewis Tribunal, the Tribe, CEDA, and CIHA. Representatives of the Lewis and Ayala Factions appeared on behalf of the Tribal entities at a hearing concerning the plaintiff's application for a TRO; representatives for the Reid Faction later appeared as well on behalf of the Tribal entities. This Court found the tribal TRO issued by Duran and the pending litigation in the Lewis Tribunal posed an imminent and irreparable threat to public safety as it sought to limit or control Anderson's exercise of his official duties. Accordingly, a TRO was issued by this Court enjoining defendants from proceeding with the action that was then pending in the Lewis Tribunal. Defendants were further enjoined not to order, issue, enforce or attempt to enforce any order, judgment, ruling or decree of any kind against Anderson, and a hearing was set to hear his application for a preliminary injunction. The parties thereafter stipulated to an extension of the TRO and, later, to imposition of a preliminary injunction on the same terms as the TRO.

Shortly after this Court entered its TRO, the complainants in the underlying Lewis Tribunal action voluntarily withdrew their tribal complaint against Anderson. Duran thereafter vacated the tribal TRO against Anderson and dismissed without prejudice the entire Tribal Court action against him.

Having since resolved their differences, at least temporarily, the Lewis and Reid Factions

conducted a joint tribal election on December 7, 2013, electing two members from each group to the four open Tribal Council seats. The combined Lewis/Reid Faction responded jointly to Anderson's motion for summary judgment and submitted a joint motion for judgment on the pleadings or, in the alternative, summary judgment. The two factions were represented by separate counsel at the hearing on these motions. The Ayala Faction, now referring to itself as the Ayala/McDonald Faction, held a separate election on the same date and continues to oppose the Lewis and Reid Factions in this matter. Results of both elections were forwarded to the BIA.

In February 2014, the BIA Pacific Regional Director issued a decision finding that no election conducted since 2011 resolved the tribal leadership dispute and declaring the BIA would recognize the last undisputed tribal council, elected in 2010, on an interim basis for government-to-government purposes. That council includes members from each of the Lewis, Reid, and Ayala/McDonald Factions. The Ayala/McDonald Faction filed a Notice of Appeal with the Interior Board of Indian Appeal, which has yet to issue a final determination of the matter, and which in any event would not necessarily resolve the dispute as only the Tribe has the authority to determine its leadership.

Anderson now moves for summary judgment on his claims for declaratory and injunctive relief. The Lewis/Reid Faction, on behalf of the individual defendants and the Tribal entities, opposes that motion and simultaneously brings a motion for judgment on the pleadings or, in the alternative, summary judgment on the grounds that this Court lacks jurisdiction over this matter. Duran and Howard joined these motions. The Ayala/McDonald Faction, while not entirely agreeing with some of Anderson's legal arguments, joins his motion as far as the relief requested and opposes the cross-motion by the Lewis/Reid Faction.

### III. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* Fed. R. Civ.

Proc. 56(c)(1)(A). If the movant succeeds, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 322 n.3; *see also* Fed. R. Civ. Proc. 56(c)(1)(B). A genuine issue of material fact is one that could reasonably be resolved in favor of the nonmoving party, and which could "affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. *See id.* at 255.

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Such a motion, is "functionally identical" to a Rule 12(b) motion to dismiss for failure to state a claim, differing only in that it is filed after pleadings are closed. *See Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989). A motion for judgment on the pleadings rests only on the facts as presented in the pleadings. When, as here, such a motion presents matters outside the pleadings, the court has discretion to consider those matters and treat the motion as one for summary judgment under Rule 56 so long as the parties are given notice and provided "a fair opportunity to present material relevant to summary judgment." *In re Mortgage Elec. Registration Sys., Inc.*, 754 F.3d 772, 781 (9th Cir. 2014). That requirement is satisfied here where defendants noticed their motion as one for judgment on the pleadings or, in the alternative, summary judgment and where the parties adopted a joint schedule to brief and offer evidence on what were effectively cross-motions for summary judgment.[2]

"When parties submit cross-motions for summary judgment, '[e]ach motion must be considered on its own merits.'" *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quoting William W. Schwarzer, et al., The Analysis and Decision of Summary Judgment Motions, 139 F.R.D. 441, 499 (Feb.1992)). "In fulfilling its duty

---

[2] The Court also informed the parties at the hearing on these motions of its intent to treat defendants' motion as one for summary judgment. None of the parties objected.

to review each cross-motion separately, the court must review the evidence submitted in support of each cross-motion." *Id.* Federal Rule of Civil Procedure 56(c) requires that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by: [] citing to particular parts of materials in the record . . . or [] showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

IV. DISCUSSION

A. Federal Court Jurisdiction

Federal courts possess only limited jurisdiction. "There is a general presumption against federal court review, and the burden of establishing the contrary rests on the party asserting jurisdiction." *Lanza v. Ashcroft*, 389 F.3d 917, 930 (9th Cir. 2004). It is well-established that jurisdiction is assessed as of the time the complaint is filed, "and subsequent events cannot divest the court of that jurisdiction." *Smith v. Campbell*, 450 F.2d 829, 832 (9th Cir. 1971); *see Mollan v. Torrance*, 22 U.S. 537, 539–40 (1824).

Anderson relies primarily on this Court's undisputed jurisdiction pursuant to 28 U.S.C. § 1331 to adjudicate the question of whether a tribal court has exceeded the limits of its jurisdiction over a nonmember. *See Strate v. A-1 Contractors*, 520 U.S. 438, 448–49 (1997) (citing *Nat'l Farmers Union Ins. Companies v. Crow Tribe of Indians (National Farmers)*, 471 U.S. 845, 852–53 (1985)).[3] That jurisdiction does not, however, extend to the looming question of the rightful leadership of the Tribe. "Tribal election disputes, like tribal elections, are key facets of internal tribal governance and are governed by tribal constitutions, statutes, or regulations." *Attorney's Process and Investigation Services, Inc. v. Sac & Fox Tribe of Mississippi in Iowa*, 609

---

[3] As a prudential matter, "a federal court should stay its hand 'until after the Tribal Court has had a full opportunity to determine its own jurisdiction.'" *El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 483 (1999) (quoting *National Farmers*, 471 U.S. at 857). That requirement appears to be satisfied here, as the Lewis Tribunal already concluded it had jurisdiction over Anderson in the underlying complaint and the Lewis Council's adjudicatory procedures do not provide for appellate review. None of the defendants now argue Anderson has failed to exhaust his tribal remedies.

ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 13-cv-04825-RS

F.3d 927, 943 (8th Cir. 2010). Such questions of tribal law are "beyond the purview of the federal agencies and the federal courts." *Id.*

This case presents the novel issue of whether a federal district court has jurisdiction consistent with *National Farmers* when the legitimacy of the tribal court is itself called into question by an ongoing tribal leadership dispute. According to the Lewis/Reid Faction, if members of the Lewis Faction were not acting as lawful tribal officers at the time of the underlying action, their actions cannot be imputed to the tribe and this dispute does not present any federal question for review. In order to implicate federal question jurisdiction, they argue, the Court would first have to resolve the tribal dispute, find the members were operating under lawful tribal authority at that time, and only then determine whether they acted beyond the scope of that authority.

Though mindful of the limits of federal court jurisdiction in matters of tribal sovereignty, the undeniable jurisdiction to consider if a tribal court has exceeded its authority over a non-member cannot be undone simply because an underlying internecine battle implicates the authority of the purported tribal court. Whether or not the Lewis Council and Tribunal constituted the legitimate tribal authority at the relevant time, defendants plausibly held themselves out as such by filing complaints and issuing orders on behalf of the Tribe. Moreover, those entities and individuals continued to hold themselves out as lawful tribal representatives through the early stages of this litigation. As noted above, jurisdiction is assessed on the facts as they existed at the moment of filing. On that basis, Anderson has satisfied his burden to establish federal court jurisdiction over this matter so long as relief may be issued without implicating non-justiciable issues of tribal governance.

B. Tribal Sovereign Immunity

Plaintiff's action is directed at three groups of defendants: the Tribal entities; the Lewis Council tribal leaders Chance Alberta, Carl Bushman, David Castillo, Lynn Chenot, Melvin Espe, Reggie Lewis, and Irene Waltz; and the Lewis Tribunal defendants Jack Duran, Jr. and Donna Howard. "Absent congressional abrogation or explicit waiver, sovereign immunity bars suit

against an Indian tribe in federal court." *Kiowa Tribe of Oklahoma*, 523 U.S. at 754. "This immunity protects tribal officials acting within the scope of their valid authority." *Burlington N. & Santa Fe Ry. Co. v. Vaughn (Vaughn)*, 509 F.3d 1085, 1091–92 (9th Cir. 2007). The parties agree that CEDA and CIHA are arms of the Tribe and, as such, enjoy the same degree of sovereign immunity.

Anderson concedes that the Tribal entities are entitled to sovereign immunity, but argues the Tribe effectively waived its sovereign immunity through the 2007 MOU and Settlement Agreement. As the party asserting waiver, it is Anderson's burden to prove the Tribal entities have "unequivocally expressed" their consent to suit. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978)

The 2007 MOU, signed by both the Tribe and CEDA, contains an explicit limited waiver of sovereign immunity:

> The Tribe agrees to a limited waiver of sovereign immunity for the purposes of completion of mediation and enforcement as provided for at Section 3 of the Settlement Agreement and Stipulation to Jurisdiction agreed to by the Parties on February 14, 2007.

MOU, ¶ 7.3. Similarly, the Settlement Agreement provides:

> Should a dispute arise as to the application, interpretation, and enforcement of the terms of this Agreement, the Parties agree to submit such dispute to mediation before a mutually agreed upon qualified mediator familiar with Indian Law. The Tribe agrees to a limited waiver of sovereign immunity for purposes of completion of such mediation.
>
> [¶]
>
> The parties each acknowledge and agree that the Tribe's waiver of sovereign immunity for purposes of the Tribal Action shall continue for purposes of any proceedings [in the Northern District] for interpretation or enforcement of the Agreement.

Settlement Agreement, ¶¶ 3.0, 3.0.1.2. The relevant question here is whether the waiver in either the MOU or the Settlement Agreement applies to this action by Anderson.

As an initial matter, defendants note that neither Anderson nor the Madera County Sheriff's office was a party to either agreement. Rather, the counter-party to the Tribal entities

was the County of Madera.  The Settlement Agreement specifically limits third-party rights including, according to the Tribe, the right to exercise the Tribe's limited waiver of sovereign immunity expressed therein.[4]  Without fully briefing the issue, Anderson has suggested he should be considered a county officer for purposes of enforcing the MOU in this action, though in other aspects he is a state official entitled to state immunity from the underlying tribal complaint.

It is not necessary to determine whether Anderson is a proper party to enforce either agreement as Anderson's complaint cannot fairly be characterized to present "a dispute . . . as to the application, interpretation, and enforcement of the terms" of either the Settlement Agreement or the MOU.  Both agreements burden the Sheriff's law enforcement duties, particularly as they pertain to the Casino.  In exchange, the Tribe agreed to certain payments to the County to offset the costs of law enforcement.  Anderson does not, however, seek to enforce the payment provisions on behalf of his office or the county.  While the underlying tribal complaint and subsequent TRO issued by the Tribal Court, if they remained in effect, might very well burden Anderson's ability to perform according to the MOU and Settlement Agreements, his challenge thereto does not "unequivocally" constitute an action to interpret or enforce the agreements.  The limited waivers therein do not extend to this action against the Tribe and CEDA.  As Anderson offers no other basis, at this time, to find consent by CIHA, all three Tribal entities must be dismissed from this action on the basis of sovereign immunity.[5]

---

[4] The Settlement Agreement provides, "Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies to any persons other than the parties to it, and their respective successors and permitted assignees.  Nothing in this Agreement is intended to relieve or discharge the obligation or liability of any third party, nor shall any provision give any third party any right or cause of action over or against any party to this Agreement."  Settlement Agreement ¶ 7.8.

[5] CIHA was not a party to either the 2007 MOU or Settlement Agreement.  Representatives of the Ayala Faction, however, entered into an agreement with Madera County on behalf of CIHA in 2013 concerning access to the CIHA facilities.  The agreement included a limited waiver of sovereign immunity for any actions by the county or the Sheriff to "interpret or enforce the terms of the Agreement."  Complaint, Exh. 12, ¶ 14.  A prior round of briefing (later withdrawn) challenged this waiver as ineffective on that basis, an argument not renewed in the current motions.  Regardless of whether this case falls within the scope of the limited waiver—and setting aside the issue of whether the agreement validly binds CIHA—Anderson does not renew his argument that the 2013 release provides any additional basis to find consent by the Tribal entities

Although sovereign immunity extends to tribal officers, such individuals may be amenable to suit for prospective injunctive relief. Under the doctrine of *Ex Parte Young*, "tribal sovereign immunity does not bar a suit for prospective relief against tribal officers allegedly acting in violation of federal law." *Vaughn*, 509 F.3d at 1092; *Salt River Project Agr. Imp. & Power Dist. v. Lee*, 672 F.3d 1176, 1181 (9th Cir. 2012) (citing *Ex parte Young*, 209 U.S. 123 (1908)). The same is true of tribal judicial officers. *See United States v. Yakima Tribal Court*, 806 F.2d 853, 861 (9th Cir. 1986).

Plaintiffs' complaint for declaratory and injunctive relief is limited to prospective, non-monetary relief as contemplated by *Ex Parte Young*. The gravamen of his complaint is that the individual defendants acted beyond the scope of any lawful authority they might possess as tribal leaders and judicial officers by exercising jurisdiction over him in the underlying suit. To the extent those claims are valid, sovereign immunity will not stand as a bar to this Court's authority. *See, e.g., Burlington N. R. Co. v. Blackfeet Tribe of Blackfeet Indian Reservation*, 924 F.2d 899, 906 (9th Cir. 1991), as amended (Mar. 18, 1991), *overruled on other grounds by Big Horn Cnty. Elec. Co-op., Inc. v. Adams*, 219 F.3d 944 (9th Cir. 2000) (recognizing *Ex Parte Young* permits injunctive action against tribal leaders but dismissing on sovereign immunity grounds after finding the officials acted within the scope of their authority).

C. Justiciability

Shortly after this Court issued the TRO enjoining defendants from enforcing the Lewis Tribunal's TRO against Anderson, the individual defendants withdrew their tribal complaint and dismissed the suit without prejudice. Anderson has submitted numerous exhibits purporting to demonstrate that tensions remain high on the Rancheria. He also submitted a letter sent from the Lewis/Reid Faction to his office shortly after the December 2013 election ostensibly prohibiting him from further contact with the Ayala/McDonald Faction or its representatives. There is no

---

to this action. As it is Anderson's burden to prove consent, the Court need not reach out to determine the applicability of a waiver upon which Anderson no longer relies.

evidence, however, that defendants have pursued any further action against Anderson in any tribal court (whether constituted by the Lewis Faction or any other representative of the Tribe).

"Voluntary cessation of challenged conduct moots a case . . . only if it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000) (quoting *United States v. Concentrated Phosphate Export Assn., Inc.*, 393 U.S. 199, 203 (1968)). The party asserting mootness bears a "heavy burden" to persuade the court that "the challenged conduct cannot reasonably be expected to start up again." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC)*, 528 U.S. 167, 189 (2000).

Although the letter from the Lewis/Reid Faction does not carry any legal authority and is not the subject of any relief properly sought in this action, it weighs against defendants in meeting their "heavy burden" to demonstrate with absolute clarity that the allegedly wrongful behavior could not reasonably be expected to recur. Defendants have not accepted Anderson's invitation to renounce any tribal court authority over Anderson in his official capacity, nor offered any assurance they would not seek the same relief previously granted by the Lewis Tribunal in the absence of this Court's continuing jurisdiction. On that basis, defendants have not shown this case to be moot.

D. Tribal Court Jurisdiction

Turning finally to the merits of Anderson's claims for declaratory and injunctive relief, the critical issue is whether the purported tribal and judicial officers acted consistent with federal law in purporting to exercise jurisdiction over Anderson. "[A]bsent express authorization by federal statute or treaty, tribal jurisdiction over the conduct of nonmembers exists only in limited circumstances." *Strate*, 520 U.S. at 445. This general rule is subject to two broad exceptions. First, a tribe may regulate "the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Montana v. United States*, 450 U.S. 544, 565–66 (1981). Second, "[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its

reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.* When tribal officials seek to assert jurisdiction over non-Indians, they bear the burden to establish one of the two *Montana* exceptions. *Atkinson Trading Co.*, 532 U.S. at 654; *Nevada v. Hicks*, 533 U.S. 353, 359 (2001).

The Lewis Tribunal's memorandum order purported to find jurisdiction under both of the *Montana* exceptions. According to the Lewis Tribunal, the 2007 settlement and MOU constitute a contractual relationship between the Tribe and County Officers, including the Sheriff. In addition, the Tribunal found the second *Montana* exception to apply as the subject of the complaint before the tribunal concerned government representation and control.

As to the first *Montana* exception, the Lewis Tribunal's reliance on the MOU is misplaced. As discussed above, Anderson is not a party to the Settlement Agreement or MOU. The Tribe may have standing to enforce his third-party obligations under these agreements, but defendants do not point to any authority finding tribal jurisdiction over third parties not otherwise bound by a tribal contract. In any case, if the purpose of the compliant in the Lewis Tribunal was to enforce contractual rights arising from the 2007 Settlement Agreement and MOU, the proper venue would have been this Court, not the Lewis Tribunal.

As to the second *Montana* exception, the Tribe would have a more compelling case if the intent of the underlying tribal complaint and TRO were to compel Anderson solely to abstain from supporting one side over the other in the intra-tribal dispute. That TRO, however, went beyond prohibiting Anderson from favoring the Ayala Faction and compelled him to recognize the Lewis Faction. For example, the Lewis Tribunal TRO prohibited Anderson in his official capacity from "dealing in any manner whatsoever with Ayala and the Ayala Faction." Complaint, Exh. 3, at 4. It further ordered Anderson to "cease and desist contravening the Lewis Tribal Council's rightful authority." *Id.*, at 5. Rather than acting to insulate the Tribe's political integrity, the tribal complaint and TRO effectively pulled Anderson into political matters of the Tribe. In sum, the

individual defendants have not shown that either of the *Montana* exceptions applies.[6]

## V.  CONCLUSION

For the reasons set forth above, Anderson's motion for summary judgment is denied and the case is dismissed as to the Tribal entities based on sovereign immunity.  His motion is granted as to the individual defendants.  Anderson is therefore entitled to a declaratory judgment that the individual defendants exceeded any lawful authority they possessed as putative representatives of the Picayune Rancheria of the Chukchansi Indians by asserting jurisdiction over Anderson in the underlying tribal court complaint.  The individual defendants are permanently enjoined from bringing in any lawfully constituted tribal court any claims that were brought or could have been brought in the underlying tribal complaint against Anderson.  The individuals are further permanently enjoined from reviving their efforts to order injunctive relief against Anderson based upon such claims.  Defendants' motion for judgment on the pleadings, construed here as a motion for summary judgment, is denied.

**IT IS SO ORDERED**.

Dated:  10/2/14

_____
RICHARD SEEBORG
United States District Judge

---

[6] In the alternative, Anderson argues he is exempt from tribal jurisdiction on the grounds of state sovereign immunity or qualified governmental immunity.  Either immunity, if applicable, would bar only the underlying claim for monetary damages and not the accompanying claim for injunctive relief.  It is not necessary to assess further Anderson's argument concerning immunity in light of the foregoing analysis.